of Medicaid Inspector General, Mr. Cowles. Yes, good morning, Your Honor. Good morning, whenever you're ready. May it please the Court, we represent the appellant for Land-Milord-Francois, and we're here today to ask the Court   for a summary judgment because the district court overlooked and ignored tribal issues of fact, and really didn't look at this case in the overall context that a jury hearing it would be entitled to. We believe this is an important case. Our client was a black attorney in a supervisory position, and she was demoted. That's why this case was brought. There are very few people like her in those positions, and now, because of the actions that were unlawful, there is one less. The key piece of evidence that should be heard by a jury that the district court did not overlook, and I don't even think mentioned in the decision, is that during the meeting when the plaintiff was being demoted from supervisory to non-supervisory position, one of the main defendants, Janine Daniels-Rivera, who was general counsel of the office, admitted, I have no problem with your work. And then when our client confronted her in that meeting and said, am I being demoted because of the white colleague that I've been complaining about, Ms. Daniels-Rivera refused to say yes or no or respond and demurred by saying, you didn't follow my vision. And in the context of this case, and all the evidence in the record, that was a reference to Ms. Millard's refusal to stop complaining about the discrimination she had received from Ms. Hensel and to actually placate this employee. Now the district court should have properly I thought there was a probation evaluation meeting in July of 2016 where your client said that she did receive negative feedback from Ms. Daniels-Rivera several times. Is that wrong? Judge, during the July meeting, that was the first time that Janine Daniels-Rivera had taken over the evaluation process. And she did receive negative feedback at that time. But that was about two months after the May 2016 meeting where Ms. Millard complained about discrimination to her supervisor Daniels-Rivera. And it is very important, the fact that Daniels-Rivera should not have been doing those probation reports at all under the civil service guidelines. But before you pivot to that, I mean, how do you square what you started with that, you know, the statement at the last the demotion meeting, I guess, where she said she didn't receive any she never, you know, it wasn't about the work with this comment or this meeting where in fact she had been confronted. She said that she admitted she had been confronted several times with negative feedback. Yes, I understood the question is basically why should the court credit her testimony about the admission? So what she was really confronted I don't think the question was, well, I could be wrong, but I didn't think the question was whether the court should be crediting it, because I don't think anybody should be crediting or not crediting anything at the summary judgment phase. But I thought the question was if there was no comment about negative feedback, she said she got no negative feedback at one point, but if it's undisputed by her that she did get negative feedback at another point right, it's sort of like she got negative feedback and then the second meeting was sort of a nothing. Yes, and I'll answer that directly. The concerns that were brought to her in July were really about the overall atmosphere in the office and how people were behaving. So I don't think it's inconsistent for Ms. Millard during the September demotion meeting to say you never had a problem with my work, because the final evaluation focused a lot on case handling and brief writing, and then it also included issues with there were references to not saying hello to Ms. Hensel in the morning. So it's not inconsistent from the July meeting that our client would say you never told me I had a problem with your work and for someone to hear this and be in a reasonable jury to say I'm going to credit that admission by Daniels Rivera that these evaluations were created as a paper trail to justify the demotion. So on this posture on summary judgment, it's not so inconsistent that a court could throw out the admission that she had no problem with her work that undermines the evaluations that had been written. And are you asking us to infer that the not following the protocol for the evaluations and hanging on to the reports that were being done by one of the colleagues and then calling into question as to whether or not the person stood by them or not? Are you asking us to also infer from that that Ms. Daniels Rivera might have had some animus in at least trying to create a paper trail? Yes, Your Honor, that's correct. We believe particularly under the motivating factor standard that the district court did not apply for Title VII that departures from the regular procedure create an inference of discrimination and also support our case that the evaluations and the performance complaints were pretextual. And those departures are very curious. What's your best evidence of discriminatory intent if in fact those were pretext? The best evidence of discriminatory intent is the May complaints to Daniels Rivera where our client complained and said I'm having trouble dealing with this person because she's calling me a scary blackface or angry blackface. The only other black woman in the office she threatened to call the police or security on and there had been a lot of investigations by HR about other complaints with her and our client was saying this isn't a supervisory issue, it's a discrimination issue and I need your help. It was a plea for help and the response was I've been called names, I've dealt with it and you're going to have to deal with it. And she said I'm just trying to keep my name out of a lawsuit. There's no way on this posture of summary judgment to say I'm just trying to keep my name out of a lawsuit. It's something a supervisor says to train an employee. So that's our best evidence that Ms. Millard was expected to conform with a stereotype that particularly African American or black employees are expected to look the other way or to ignore or gloss over. I'm sorry, what's the basis for your imprints that comment by Ms. Daniels Rivera was designed to tell your client to look away as opposed to saying you're the manager. So if you've got a problem, you've got to deal with it, not to look the other way, but to deal with it. I thought those were the words. Well, Your Honor, when you couple that with I'm just and then Mr. Rosen also had said Ms. Hensel should sue you and Latwanda Manson, who are the only two black employees in the office. So when you look at the overall context, that is enough to infer that this was a warning to stop complaining about this employee who it's undisputed that she had the ear of Mr. Rosen, who was running the office. And Mr. Rosen said if she's not happy, you're going to be fired. Stop complaining. It seems different. It seems you have to figure out how to deal with it. Those are very different sort of messages. Well, all I can say is that on summary judgment, all reasonable inferences must be construed in our favor. And we're just asking this court to reverse summary judgment because we don't believe the district court construed in our favor. A juror could come to the same conclusion that your honors are raising, and that's fine. We can argue that to a jury, but to not get the benefit of the inference is a misapplication of summary judgment. So that's really our point today is that you're saying that the comment deal with it is ambiguous, and it could be interpreted to mean suck it up, roll with it, ignore it. Or it could mean what your opponent suggests, which is deal with it in the sense of actively deal with it. You know, your supervisor responds, and you're saying that either inference is possible and therefore summary judgment is not appropriate here. Yes, that's exactly right. Can you tie in how Feingold plays to that, what this circuit has said as to comments like deal with it? Yes. We cite to Feingold, and it speaks to the idea that you can have discrimination where someone is discriminated against because they refuse to conform to be someone in the office that's going to put up or ignore discrimination. So Feingold shows that it's not just a retaliation claim. It can actually be a discrimination. An inference of discrimination, that someone is being told you have to deal with discriminatory behavior. Yes, and I think it's important that Daniels-Rivera is a Black woman, but that's not a weakness of our case. That's a strength because it's very clear that two people, I think, of the same race could come in and level with each other and say, look, this has happened to me. I've been called names, but I had to deal with it, and I want to keep my name out of a lawsuit, so you need to stop complaining about this person who has the ear of management. Management has said, if she's not happy, hit the door, and there's a whole bunch of quotes in the record. So Feingold is directly on point with this, that the environment is altered when someone, it's clear to management that, okay, I promoted you in September, but now you're not following what I want you to do, which is to ignore discrimination, and then all bets are off. There's no same actor inference that was argued below and in the district court position, and I think that's what Feingold speaks to, that when things change dramatically, being promoted and everything like that doesn't undermine an inference of discrimination. Are you also suggesting that the jury could infer from my vision, that you're not comporting with my vision, that that is a roll with it kind of environment, like you need to roll with the discrimination that's happening to you? Is that something that you're arguing that the jury could infer? Yes, Your Honor, that is what we were saying, particularly that the my vision comment goes back to the May meeting, which is deal with it, I'm just trying to keep my name out of a lawsuit. She refused to answer, is this because of Robin Hensel, which basically means, is it because I complained about her, I wasn't going to say hello to her every morning, and the plaintiff was even forced to apologize to Ms. Hensel, and really the thing that the district court overlooked in this environment is that Hensel was not even Ms. Millard's supervisee. The supervisor was supposed to be Mr. Mandel, and Mr. Mandel never had his feet really held to the fire about Hensel's behavior, which resulted in two different investigations with HR, and HR even finding in a report that Ms. Hensel was disruptive, had some odd behavior, and might even need a referral to some sort of counseling. So when all that's put together in the overall context, yes, it's vision refers back to how they wanted to treat Ms. Hensel, and it came right from the MIG, the Medicaid Inspector General, Mr. Rosen, that this was someone that was not going to be messed with, and Ms. Millard, if she didn't shape up and treat her nicely, was going to be fired, which was basically demoted because they're civil servants, so you can't just outright fire them. So yes, there is a strong connection between my vision and the prior conversations. Thank you, counsel. You've reserved a couple minutes for rebuttal. Yes, two minutes for rebuttal, thank you. Thank you. We'll hear from Mr. Yanni. Thank you, and may it please the court, Stephen Yanni for the defendants at police. The court should affirm because there's no evidence that the decision maker in this case, Ms. Daniels Rivera, demoted plaintiff due to race just one year after promoting her. Indeed plaintiff admits that Ms. Daniels Rivera never made a single remark about her race. Instead, plaintiff attempts to turn a coworker's offensive comments made the year before she was demoted into a claim against the agency's general counsel by suggesting that Ms. Daniels Rivera believes that Black employees should condone racism. But the record doesn't support that theory, and the timeline of events here makes clear that plaintiff was demoted for legitimate reasons. Critically, plaintiff's performance issues predate the May 2016 meeting on which her claims turn, and she was not demoted until four months later. Indeed, the concerns with plaintiff's abilities as a manager existed since her nomination for the position. The nomination form noted that she had a lack of supervisory experience, and unfortunately those issues never resolved themselves. In January 2016, for example, Ms. Daniels Rivera requested that plaintiff's positive performance review be revised to reflect her performance as a supervisor, and issues continued into March 2016. When you respond to the idea that Ms., or the allegation that Ms. Daniels Rivera was manipulating Mr. Glick's reports in order to create a paper trail to coach her out or to devote her? Sure, Your Honor. So, Ms. Daniels Rivera testified that she revised these reports because she felt that, similar to her comments in January 2016, they didn't reflect plaintiff's... Well, how is that inconsistent, though? She didn't fail, right? The part that I'm struggling with is how when she was inconsistent about Glick to the EEOC, and Glick stands by his report, how we're not supposed to infer that Ms. Daniels Rivera was trying to cover up her own role in the direct discrimination. Well, addressing Your Honor's original question, your first question, Ms. Daniels Rivera testified that she felt this probation report didn't adequately encapsulate plaintiff's abilities as a supervisor, and she didn't just take over revising plaintiff's report. She also revised the report prepared by Glick for a white employee who was an associate attorney, Mr. Mandel, and that destroys any inference that Ms. Daniels Rivera was revising this report for a discriminatory reason. Why is that, if Mr. Mandel is the comparator that you guys are using? That seems to me to actually buttress Ms. Millard's argument, right? The white employee has gotten a hand, a help or an assist by Ms. Daniels Rivera to be puffed up, and the black female employee is getting her report manipulated so that there's a paper trail suggesting she is underperforming. Well, in fact, Your Honor, Ms. Daniels Rivera revised downward both plaintiff and Mr. Mandel's reports, and they had almost identical scores on the quality of their work and management skills, etc. Indeed, Mr. Mandel's report was highly critical. It also blamed him for some of the problems in the office atmosphere. I'd refer the court to the record at page 206, and Ms. Daniels Rivera also made other critical comments about Mr. Mandel, including that he used the Internet too much at work, etc. So she took both positive reports from Mr. Glick and revised them downward. But who was demoted? Plaintiff was demoted, Your Honor, but her and Mr. Mandel weren't similarly situated in that respect. For example, there's no evidence that Mr. Mandel engaged in the same type of disparaging of the general counsel and sharing confidential information that plaintiff did here, and it's also undisputed according to Ms. Daniels Rivera that Mr. Mandel worked to address the concerns that she had, which is why his probation eventually was passed. So, excuse me, counsel, so at least as I understand your argument on this point, you're saying that Ms. Daniels Rivera's intervening with respect to the performance evaluations does not give rise to an inference of discrimination because she intervened with respect to both of them and downgraded the performance reviews of both of them? Is that what you're saying on this point? That's exactly right, Your Honor. So could you turn to the deal with it language? Your opponent argues that the comment, you have to deal with it, is ambiguous. Or maybe they argue it can only be construed one way, but let's say they argue it's ambiguous, and maybe it can be read maybe even more in the way that you suggest, which is you should actively deal with it. You're a supervisor now, and if somebody makes an inappropriate comment, you're the one who actually has to tamp it down and stop it. But couldn't it also be interpreted in the way that your opponent suggests, which is deal with it, suck it up, roll with it, ignore it? This is just part of what you need to expect and absorb as a supervisor. Why is that? Why don't you explain to us why that is not an ambiguous comment, therefore something that would be appropriate for resolution by the jury? Sure. And at the outset, Your Honor, I note that because the comment is vague and oblique and remote in time, that makes it at the outset a poor indicator of discriminatory motivation under this circuit's case law. But with respect to how the comment should be understood in context, in addition to the reasons provided in our brief, which we agree makes clear that the only reasonable interpretation of this comment is that plaintiffs should work to address these issues rather than ignore them. There was no statement by plaintiff as opposing counsel noted that she said, I need your help. That's nowhere in the record here. And plaintiff's theory is moreover totally at odds with Ms. Daniels-Rivera's testimony that she herself had once reported incident to Human Resources where she had felt threatened by a former employee. That's at page 987 to 88 of the record. Now, Ms. Daniels-Rivera couldn't remember if that pertained to discrimination, but it certainly upends plaintiff's argument that Ms. Daniels-Rivera believed that Black employees should endure abuse and not report incidents to management. But critically, Your Honor, regardless of the interpretation of this specific comment, we believe that the timeline here in that the May 2016 meeting is straddled by concerns about plaintiff's motivation makes clear that she was demoted for legitimate reasons. I'm sorry, can I ask, is it the position of the State Attorney General that mixed motives are still good law, that one can find a mixed motive in an adverse employment action? It's certainly true that, with respect to the discrimination claim at least, plaintiff needs only show that discrimination was a motivating factor. We don't dispute that, Your Honor. Of course, for the retaliation claim, there's a more onerous burden where plaintiff has to show that there's a but-for cause. But we think that the timeline here and the demonstrated performance issues, in any event, make clear that the reasons here were legitimate. Now, the plaintiff claimed that the most important piece of evidence, he said, was the fact that there was allegedly no issue with plaintiff's performance, but that's just belied by the record. As Judge Park mentioned, the July 2016 probation report contained numerous deficiencies with plaintiff's performance, and they weren't just limited to the issues with confidential information and disparaging remarks and relationship issues. The report also noted deficiencies in plaintiff's legal work, issues with managing her caseload, and these are also documented by contemporaneous emails, and I would point the court to 214 to 17 in the record, and also 157 and 197. In that case, that was in March. Before this May 2016 meeting ever took place, Ms. Daniels-Rivera emailed plaintiff stating that one of the probation reports she had prepared for a supervisee was insufficient. Now, I would like to turn to plaintiff's claims against Mr. Rosen, and those fail here because, as the district court determined, he had no meaningful role in her demotion. The record is clear that the decision whether to demote plaintiff was Ms. Daniels-Rivera's alone, and nothing in the record contradicts that. As such, the plaintiff's cat's paw theory necessarily fails as to Mr. Rosen, and the retaliation claim also fails as well for the same reason. And lastly, plaintiff brought a hostile work environment claim in this case, which was much addressed today and not addressed in plaintiff's reply brief, but plaintiff doesn't come close to meeting this circuit's standard for a hostile work environment claim, which requires persistent and severe discriminatory conduct that alters the conditions of employment. Can you answer or can you respond to the argument that one of the actions that she was subject to was disparate treatment because her work was being more carefully scrutinized? And I'm interested in the July 7th email from the HR saying that you start collecting emails to show with their issues. Sure. So, Your Honor, the record, page 1346, shows that Ms. Daniels-Rivera was in contact with HR, both with respect to plaintiff and with respect to Mr. Mandel, who was white. I would also note that Mr. Mandel testified that he communicated with Ms. Daniels-Rivera on a daily basis about his cases. Ms. Dolman, who was also white, testified that Ms. Daniels-Rivera. I'm sorry, so the response to the argument that she was scrutinized more carefully is that she also scrutinized Mandel? I just want to make sure I understand. Well, the record indicates that Ms. Daniels-Rivera was closely scrutinizing many employees, not just plaintiff. Mr. Mandel testified that he was in contact with Ms. Daniels-Rivera on a daily basis regarding his cases. And Ms. Tina Dolman, who was white, testified that Ms. Daniels-Rivera reviewed all of her work as well. So we would argue this is not unique to plaintiff. And she testified that there's a variety of work that Ms. Daniels-Rivera was reviewing. And it's also consistent with, I mean, it's also it's not surprising that plaintiff's work may have been looked at more carefully by Ms. Daniels-Rivera when she was on probationary period because Ms. Daniels-Rivera was trying to assess whether she should be kept in this supervisory role. So unless the court has any further questions, we'd ask you to affirm. Thank you. Thank you, counsel. Mr. Cowles, you reserve two minutes for rebuttal. Yes, thank you, Your Honor. I want to return to the deal with it comment because Daniels-Rivera can I just ask you, I want to hear what you have to say on that, but I just want to also know, is that the universe we're talking about? Are there other, is there other evidence in the record going to discriminatory animus or is this what we're primarily what we're focusing on? Well, yes, we would focus on the two meetings. One is May and one is September bookend about how she was supposed to conduct herself in the office in response to Ms. Hensel conduct. Yes, in response to Ms. Hensel's conduct. There's more evidence of pretext that we lay out in her brief, but these meetings are the main. So the focus is really how what Ms. Daniels-Rivera was saying about how to manage Ms. Hensel. Yes. Okay, go ahead, please. Yes, and with the deal with it Daniels-Rivera admits that as OMIG supervisor she had an obligation to report discrimination when it was brought to her attention. So saying deal with it isn't even proper under the OMIG policy or local and federal law that requires supervisors to report discrimination complaints. So it's not something that she was even allowed under the city or state policy to just brush off and say you deal with it yourself. We have policies and laws about how that's supposed to be handled. And you would say that the May meeting, the statements by your client constitute a complaint. Yes. Now I really want to hit the January 2016 evaluations because this is a very strong point for us that the district court did not look at correctly. Ms. Millard was promoted in August or September of 2016 depends on whether you call it official or not. So for all of the fall of 2015, no problem with her writing, her behavior, nothing. Ms. Daniels-Rivera was not involved, had no complaints. And in January, what was done is Mr. Glick submitted evaluations. No complaint about the actual substance or any complaints about Ms. Millard's behavior, but she was just telling Mr. Glick make sure you cover them not just as attorneys, but as supervisors. So give me some more information about that. That in no way supports this idea that Ms. Daniels-Rivera was being critical. I'm sorry, could you give us a page citation where Ms. Daniels-Rivera specifically said, it seems to me you're suggesting that she actually said directly, I have no problem with her work performance. I only want more information about the supervisory activity. Where should I look for that? Well, you're right. That's not a direct quote. That's the reasonable inference that someone reading her email to Glick could make. And the district court read it as, oh, because she's asking him to add more information about their behavior and conduct as supervisors because they're new supervisors, that somehow someone can make the inference that Ms. Daniels-Rivera had a problem with their conduct or their performance. But it was really that Glick didn't do a fully complete evaluation. It was generic and bland. It was sort of the standard, I'm a supervisor, but I'm not really telling you anything at all about my supervisee. I'm just putting in generic statements and checking the boxes. I mean, that seems to be the only reading I got is this is not customized to either of these employees. Well, at that point, that's what the feedback was to Mr. Glick. But for the district court to say I guess I'm not sure what negative inference can be drawn from that to say you've given me this generic latitude of a performance review. I need specifics here. I don't see the negative inference to be given that. Well, neither do we. But what the district court said is. So you don't see any negative inference. You don't see any inference to be drawn in favor of your client from that. Is that what you just said? No. We see that Glick believed that she was doing a good job and didn't have anything negative to say in which he said under oath after they told the EEOC oh, he agreed that she was a bad supervisor. No, I'm talking about Ms. Daniels-Rivera's response to those. Yes. In January 2016, she only had an issue with Mr. Glick not being verbose and including everything about them as supervisors. She didn't have any specific problems that she raised in her email. So the district court. Right. But that's what I'm saying. You would draw a negative inference that because she didn't criticize Mr. Glick specifically for that, you're saying we need to infer that she was actually satisfied. Yes. That's the inference you think that a jury could reasonably draw. But if she didn't mention a criticism, she was satisfied with anything she didn't criticize. That's correct. And what's very important to that is Mr. Glick then revised it, emailed it back to Ms. Daniels-Rivera and Ms. Daniels-Rivera never sent it back again. She never looked at it. She didn't meet with there's nothing in the record that shows she ever cared again until our client complained of discrimination. And then in July, this the absence of any follow up or not having this on the front burner and just sort of ignoring the second revision for Mr. Glick speaks to the fact that this really wasn't a problem until Mr. Rosen and Ms. Hensel put a lot of pressure on Daniels-Rivera to make sure there weren't complaints and that Ms. Hensel was comfortable, which in this case was discriminatory towards our client. So that's very important. I see I'm out of time unless there's any other questions. Thank you very much. Thank you, counsel. We'll take the case under advisement.